UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:19-cv-22620-FAM

_____

**Mario Echevarria**, **Esther Sanchez**,
**Consuelo Cuevas**, and **Carmen Florido**,

      Plaintiffs,

v.

**Expedia Group, Inc., Hotels.com L.P.,
Hotels.com GP, LLC, Orbitz, LLC,**

      Defendants.

_____

*Consolidated with*

Case No. 1:19-cv-22621-FAM

_____

**Mario Echevarria**, individually and on behalf
of all other similarly situated,

      Plaintiff,

v.

**Expedia Group, Inc., Hotels.com L.P.,
Hotels.com GP, LLC, Orbitz, LLC,**

      Defendants.

_____

**DEFENDANTS' RULE 50(b) RENEWED MOTION
FOR JUDGMENT AS A MATTER OF LAW**

<u>TABLE OF CONTENTS</u>

ARGUMENT ......................................................................................................................... 1

    A.    The Court must render a judgment before September 15, 2025. ..................................... 1

    B.    Ownership of Cayo Coco ................................................................................................ 1

           1.    No evidence that Juan Francisco Angulo acquired ownership of Cayo
               Coco from the Spanish Crown. ............................................................................ 1

           2.    No evidence regarding succession of inheritance. ............................................... 2

           3.    Arguments regarding any difficulty in obtaining documents from
               Cuba cannot substitute for actual evidence ......................................................... 3

    C.    Damages ........................................................................................................................... 5

           1.    No evidence of Plaintiff's percentage interest. ..................................................... 5

           2.    There is no evidence of the fair market value of the property that was
               allegedly confiscated and trafficked ...................................................................... 6

           3.    The damages calculation violates due process and reveals Plaintiff's
               lack of constitutional standing. ............................................................................ 8

    D.    The residential use exception to the Helms-Burton Act applies. ................................. 11

    E.    The Corporate Entities ................................................................................................. 12

           1.    There is no evidence to hold Expedia Group, Inc., liable for
               trafficking. .......................................................................................................... 12

           2.    Orbitz and Hotels.com LP did not facilitate bookings at all hotels. ................. 14

    F.    Defendants did not "knowingly and intentionally" traffic in confiscated
        property ........................................................................................................................... 15

    G.    There was no evidence the hotel bookings were not incident to lawful travel. .......... 18

    H.    Helms-Burton does not apply to property confiscated from a Cuban national
        by the Cuban government. ............................................................................................ 19

Conclusion ............................................................................................................................ 19

4934-7356-8850

This case has been tried, and the jury has rendered a verdict. Defendants file this motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) because Plaintiff failed to present competent evidence regarding numerous essential elements of his cause of action. "[I]n ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Chaney v. City of Orlando, Fla.*, 483 F.3d 1221, 1227 (11th Cir. 2007). For the reasons discussed below, the Court should grant this motion and render judgment as a matter of law.

<u>ARGUMENT</u>

A.    <u>The Court must render a judgment before September 15, 2025.</u>

Rule 58(c) enters judgment as a matter of law if no judgment has been entered by 150 days after a jury verdict has been entered on the court's docket. Fed. R. Civ. P. 58(c) (emphasis added). Courts in this district have interpreted this rule to mean that judgment is considered "entered" 150 days after jury verdict forms are entered on the docket. *See Eghnayem v. Boston Sci. Corp.*, No. 1:14-CV-024061, 2016 WL 4051311, at \*20 (S.D. Fla. Mar. 17, 2016), *aff'd*, 873 F.3d 1304 (11th Cir. 2017) ("Rule 58(c)…provides that unless set out in a separate document, judgment is deemed entered 150 days after the entry of the verdict forms on the civil docket.").

Here, the four verdict forms were entered on the docket on April 18. 22620-477, 478, 479, 480. September 15 is 150 days after the verdict forms were entered. Thus, if this Court has not entered judgment by September 15, the four separate verdict forms will be deemed to be entered as judgments on that date. Defendants urge the Court to enter judgment before September 15.

B.    <u>Ownership of Cayo Coco</u>

1.    <u>No evidence that Juan Francisco Angulo acquired ownership of Cayo Coco from the Spanish Crown.</u>

It is essential that Plaintiff prove that his great-great-grandfather Juan Francisco Angulo acquired title from the Spanish crown because the law presumed "that islands formed in the seas adjacent to the coast of Cuba…belong to the State." Cuba Civil Code of 1889, Art. 371; *see also* The Law of Waters, Art. 1-4 (providing that "islands formed in the maritime zone" are "in the national domain and for public use").[1] There was also evidence that the Cuban state affirmatively exercised its ownership interest over Cayo Coco during the Spanish colonial period, during the transitional government after independence, and under the Republic of Cuba by leasing the island for timber and

---

[1]  These authorities were the subject of expert testimony at trial and at the Rule 44.1 hearing on Cuban law. The provisions of The Law of Waters can be found at 22620-440. The provisions of the Cuba Civil Coded of 1889 were discussed at Trial Tr. vol.3, 220:25–221:21; Apr. 1, 2025 Hearing Tr. 85:21–87:15; 199:2–200:20.

other activities. D-150, D-201, D-202; *see also* Trial Tr. vol.3, 147:24-157:10 (testimony of Ambar Diaz). Because the law presumed that the Cuban State owned islands like Cayo Coco absent affirmative evidence of a transfer of title from the State, and because the Cuban State actually exercised that ownership over Cayo Coco, proving such a transfer to an ancestor is thus a crucial first link in Plaintiff's claimed ownership because, if the State already owned Cayo Coco, then it could not have been confiscated at the time of the Revolution.

Plaintiff failed to identify or proffer any evidence of a conveyance of Cayo Coco from the Spanish crown to Plaintiff's ancestor, Juan Francisco Angulo, because there is no such evidence. And if that ancestor never acquired title from the Spanish crown, then there was no title for him to pass down to his descendants. Without evidence that Juan Francisco Angulo acquired title to Cayo Coco, all of the "yellow documents" presented at trial purporting to pass title from Juan Francisco Angulo's son-in-law Julian Cuevas down the family tree to Plaintiff are meaningless because a person cannot sell (or bequeath) property he does not own.

Moreover, those documents include conflicting claims of ownership and do not paint the clear picture Plaintiff asserts. For example, Julian Cuevas's 1928 will did not claim ownership of Cayo Coco at that time but instead claimed that his "assets" included certain "credits," "one of which is *a mortgage* on the Cayo Coco property." PLA0066 p.000158 (emphasis added). The protocolization of Julian Cuevas's estate, dated four years later in 1932, includes self-certification by his heirs that Julian Cuevas owned an undivided interest in Cayo Coco. PLA0066 p.000171. But there is no evidence explaining that four-year gap or how Julian Cuevas allegedly re-acquired ownership of Cayo Coco when his 1928 will attested that he owned only a mortgage. Further, the February 1957 declaration of heirs of Julian Cuevas's daughter Maria Teresa Exipia Cuevas y Angulo states that "the decedent left no property of any kind." PLA0004 p.000150. The exhibits reflect various self-claims of ownership, and family members' testimony reflects that the family may have believed it owned Cayo Coco. But believing that something is true cannot substitute for actual evidence of ownership. And actual evidence of ownership is lacking here.

Plaintiff disputes that Cuban law reserves coastal islands like Cayo Coco as property of the state in the national domain. That contention is incorrect, but even if Plaintiff is correct about state ownership, the absence of *any* evidence of a transfer of ownership of Cayo Coco to Juan Francisco Angulo is fatal to Plaintiff's claim. If Juan Francisco Angulo never acquired ownership of Cayo Coco, then no claim to such ownership passed to Plaintiff, irrespective of whether the Cuban State or some other person or entity owned it in the 19th century.

    2.    <u>No evidence regarding succession of inheritance.</u>

Plaintiff presented no evidence establishing that ownership interests in Cayo Coco passed by inheritance down the family tree to him. There are four generational transfers that Plaintiff must

account for: (1) from Juan Francisco Angulo to his son-in-law Julian Cuevas and/or daughter, Isabel Angulo[2]; (2) from Julian Cuevas and/or Isabel Angulo to their daughter Elvira Cuevas Echevarria; (3) from Elvira Cuevas Echevarria to her son, Julian Echevarria; and (4) from Julian Echevarria to his son, Plaintiff. There were also numerous intra-generational transfers in Plaintiff's chain of title. Some transfers involve persons who died in Cuba, so those transfers of ownership by inheritance must be according to Cuban law. Some died in Miami, so those transfers of ownership would be evaluated according to Florida law.

Plaintiff contends that an ownership interest in Cayo Coco passed to him through intestate succession. PLA0066 purports to memorialize distribution of the estate of Julian Cuevas. That is an example of what sort of documentation is sufficient to demonstrate inheritance of whatever real property the decedent actually owned at the time of death. But there is no such evidence documenting inheritance for any of the other required transfers of ownership. There is no evidence of succession from Juan Francisco Angulo to Julian Cuevas, or from Elvira Cuevas Echevarria to Julian Echevarria. Nor is there evidence of the final required succession step: from Julian Echevarria to Plaintiff. Julian Echevarria died in Florida, but Plaintiff presented no evidence regarding how any property ownership would pass from Julian Echevarria under Florida intestate succession.

Independent of the lack of documentary evidence regarding succession, Plaintiff failed to present any expert testimony explaining how the applicable laws of intestate succession under Cuban law and Florida law would apply to inheritance of any ownership interest in Cayo Coco. That is not a subject that a lay jury can determine, and it is improper for counsel to provide expert testimony under the guise of closing argument to explain how the rules of succession operate here.

The lack of evidence regarding the chain of inheritance creates fatal gaps in Plaintiff's purported ownership of a claim to Cayo Coco, which is a necessary element of his cause of action.

3.   Arguments regarding any difficulty in obtaining documents from Cuba cannot substitute for actual evidence.

Plaintiff argues that he should be given a pass regarding ownership documents because Cuban law adopted in 1996 criminalizes efforts to secure property records from Cuba for purposes of Helms-Burton suits. But difficulty of proof cannot relieve a party of his statutory burden of proof. Relieving Plaintiff of the burden of proving his claims against Defendants—in a suit where he seeks to recover tens of millions of dollars—would improperly and unfairly penalize Defendants.

---

[2] Plaintiff's counsel in closing argument purported to trace the inheritance evidence in order to derive the 12.5% ownership Plaintiff claims, but his argument was inconsistent regarding how Isabel Angulo or Julian Cuevas actually inherited the interest from Isabel's father, Juan Francisco Angulo. *See, e.g.*, Trial Tr. vol.8, 47:6-14 (interest in Cayo Coco adjudicated to Isabel Angulo in testamentary proceedings of Juan Francisco Angulo; Julian Cuevas acquired an interest through his marriage to her); 50:18-24 (Isabel has half of the ownership interest and Julian has the other half).

Moreover, as a factual matter, there was testimony that Plaintiff's aunt Rosa Elvira Echevarria ("Popa") kept extensive and diligent records. Plaintiff's niece Carmen Davis testified that Popa "kept the record of Cayo Coco." Trial Tr. vol.2, 119:6-11. Both Davis and Plaintiff's cousin Consuelo Cuevas testified that they remember Popa "doing all the paperwork" and maintaining a "big book" of meticulous Cayo Coco records in a small room of her home. *Id.* at 119-20, 132.

The record further reflects that Plaintiff and his family members could—and at times did—secure documents relating to Cayo Coco. For example, Carmen Cuevas y Angulo in 1959 secured a copy of the 1932 Protocolization document relating to the distribution of the estate of Julian Cuevas. (PLA0066) She also secured the copy of Maria Teresa Exipia Cuevas y Angulo's probate document in 1956. (PLA0004) If there existed a deed or other ownership document conveying Cayo Coco to Juan Francisco Angulo, she could have secured that as well.

Similarly, Plaintiff's nephew Julio Antonio Echevarria testified that his father Julio Echevarria obtained PLA0055 from the property records in Moron in 1995, long after the revolution. Trial Tr. vol.1, 95:24-96:6. If there existed, for example, documentation regarding the succession by inheritance from Elvira Cuevas Echevarria to her children Rosa Elvira and Julian Echevarria, he could have gotten a copy of it from the property records in Moron at that time. Moreover, Julio Antonio Echevarria testified that he brought family property documents from Cuba to the U.S. in 2019. Trial Tr. vol.1, 79:7-23. And Plaintiff's agent Enrique Reboredo testified that in 2024 he sent his niece to retrieve documents from the property registry, but no documents were retrieved. Thus, despite the alleged prohibition on requesting such documents, Plaintiff took the exact steps he now contends cannot be taken.

Through the years, the family secured and maintained their important papers and had access to them for years. Plaintiff today lacks documentary evidence proving ownership of Cayo Coco not because of recent Cuban enactments aimed at Helms-Burton laws, but because such documents do not exist. After a full and fair opportunity to present his case, Plaintiff provided no evidence that his ancestor Juan Francisco Angulo validly acquired ownership of Cayo Coco, or that ownership interests in Cayo Coco passed by inheritance down the family tree to Plaintiff. A reasonable jury would thus not have a legally sufficient evidentiary basis to find for Plaintiff as to confiscation or ownership of a claim. The Court should grant judgment as a matter of law to Defendants.[3]

---

[3] Plaintiff cannot overcome the lack of record title by relying on title by prescription. There is no evidence that Plaintiff or his ancestors maintained the requisite uninterrupted possession of Cayo Coco for the requisite period of time to acquire title by prescription. Plaintiff never pled prescription, and the Court did not instruct the jury regarding the law of prescription in Cuba.

C.    Damages.

The measure of damages for a Helms-Burton cause of action is the current fair market value of the property that was confiscated by the Cuban government and that the defendant allegedly trafficked. 22 U.S.C. §6082(a)(1)(A)(i)(III). Here, Plaintiff's proffered damages calculation has two components: (1) the percentage interest Plaintiff claims he owns in Cayo Coco and (2) the fair market value of the Subject Hotels that Plaintiff contends were built on confiscated land in Cayo Coco and improperly trafficked. Each of those parts is necessary for Plaintiff's damages calculation.

1.    No evidence of Plaintiff's percentage interest.

Plaintiff was the only witness who testified regarding his percentage interest, and his testimony failed to offer any explanation of how the percentage should be calculated. He testified that he does not own the entire interest in Cayo Coco, but that he owns 12.5%, and his counsel stipulated that he has made a claim for 12.5%. Trial Tr. vol.2, 12:8-25. Plaintiff could not explain how he arrived at the 12.5%.

Plaintiff's counsel argued (testified, really) in closing that the 12.5% is derived from the ownership interest owned by Plaintiff's father Julian Echevarria, who owned a half-interest in Cayo Coco, divided evenly among four of his children: Aureliano, Carmen, Julio and Plaintiff Mario Echevarria. Trial Tr. vol.8, 54:13-56:13. Plaintiff did not offer any expert testimony or any other evidence explaining how he could thereby have inherited 12.5% interest. And, such an argument ignores the ownership interest of the fifth child, Carlos Echevarria. Carlos died in Florida in 1988, after his father Julian but before his mother Cira Marquez. Under Florida intestacy law, after Julian Echevarria died, the first $20,000 of his estate went to his surviving spouse Cira, and the remainder of the estate passed one-half to Cira and one-half to each of his five children. At that point, therefore, Carlos inherited one-fifth of one-half of Julian Echevarria's remainder estate, which included his interest in Cayo Coco.

Florida intestacy law provided that Cira inherited $20,000 plus one-half of the remainder of Julian Echevarria's estate, so the other one-half of Julian's remainder estate divided among his five children may have resulted in something less than an actual one-fifth ownership interest in Cayo Coco descending to each child. There was no evidence regarding the size of Julian Echevarria's estate, so there is no evidence regarding whether the initial $20,000 passed to Cira included a partial interest in Cayo Coco, such that the remaining one-half of Julian's remainder estate actually included something less than a full one-half interest in Cayo Coco.

The missing evidence regarding the size of Julian Echevarria's estate is not the only deficiency in proof relating to Carlos Echevarria. The evidence includes the wills of Carlos Echevarria and his sister Carmen Echevarria. D-142, D-141. The two wills are identical. Each bequeaths everything to Carmen Echevarria's daughter Carmen Davis. D-141, D-142 at ¶ Fourth; *see also* Trial Tr. vol. 2, 27:17–28:7. And each also includes an identical provision that any property held as joint

5

tenants with rights of survivorship should go to the joint tenant. *Id.* at ¶ Third. Though the wills are identical, Plaintiff's theory is that Carmen's will is effective to transfer her entire interest in Cayo Coco to Carmen Davis, but Carlos's will is not. The same language, however, must have the same legal effect. Either <u>both</u> Carmen's and Carlos's ownership interests in Cayo Coco passed to Carmen Davis, or <u>neither</u> of their ownership interests in Cayo Coco passed to Carmen Davis. But in either event, Plaintiff does not end up with 12.5%. That can happen only if Carmen's interest passes to Carmen Davis under Carmen's will but Carlos's interest defaults back to his surviving siblings.

Counsel's closing argument acknowledged this defect and presented "alternate scenarios" regarding the percentage ownership. One was a calculation that Plaintiff owns 12.5% interest (if only Carmen's will is effective), the other reflects an "Alternate Scenario" that Plaintiff owns 11.25% (if both wills are effective). Plaintiff's counsel told the jury that "our position is when Carlos dies, it goes back to the other living heir who has ownership" because "Cayo Coco was owned *pro indiviso.*" Trial Tr. vol.8, 55:8-15. He told the jury that "we believe it's 12.5. They're saying it's 11.25. That's the big difference." *id.* 56:10-12. The jury thus had no evidence to decide between the two "Alternate Scenarios," and no evidence regarding what *pro indiviso* means or its implication for inheritance rights. They simply picked between the two scenarios based on which party supported which one, like eeny, meeny, miney, moe.[4] That is no more than speculation or guess, and it cannot support a judgment for Plaintiff. *de Fernandez v. Seaboard Marine Ltd.*, 135 F.4th 939, 957 (11th Cir. 2025).

> 2. <u>There is no evidence of the fair market value of the property that was allegedly confiscated and trafficked.</u>

The sole evidence Plaintiff offered to prove the current fair market value of the subject property were the opinions of his valuation expert, Francis Nardozza.

Nardozza testified to his opinion of the value of the hotels in its "totality." This "totality" valuation combined **three** components: (1) the land on which the hotels stand, (2) improvements to the land (e.g., the hotel buildings), and (3) the value of the ongoing hotel operations**.** Trial Tr. vol.7, 34:13-35:2. Nardozza's valuations combine not just the value of the land and the improvements, but also include the value of "**the business operations** contained within." Trial Tr. vol.7, 35:18-22.

Plaintiff's cause of action is defined by and limited to the "property which was confiscated" and in which Defendants allegedly trafficked. *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, 119 F.4th 1276, 1286–87 (11th Cir. 2024) ("[T]he trafficking must be in the property that was confiscated."). That is, the property at issue in a Helms-Burton suit is the property interest that Plaintiff would have owned had there been no confiscation. *Id.* at 1287. And it is the current fair market value of "**that** property" interest that defines the proper measure of statutory damages. 22 U.S.C.

---

[4] This is not a *de minimis* issue. The difference between 11.25% and 12.5% ownership interest results in an additional $995,000 in the damages as found by the jury, or $2,985,000 if trebled.

§ 6082(a)(1)(A)(i)(III). Because Nardozza's valuation includes the entire value of the businesses operating the hotels, it reflects an improper measure of damages and is no evidence at all of the proper measure. At trial, Nardozza testified for the first time that the land value was 18-25% of the totality valuation, an opinion he had never previously disclosed.[5] Trial Tr. vol.7, 18:12-16. The jury's verdict reflected Nardozza's totality opinion, not the 18-25% land-value portion.[6]

Even if the combined value of the Subject Hotels were a proper form of statutory damages (it is not), Nardozza's opinions would still be no evidence because they are unreliable as they are (i) inconsistent with relevant appraisal standards, (ii) based on an assumption that contradicts the undisputed facts of the case (i.e., that the hotels could be sold in a competitive and open market to a third party today), and (iii) inherently speculative.

Determining the fair market value of commercial property in Cuba is challenging because of the nature of the communist government. Nardozza acknowledged that "agencies of the Cuban government" own the hotels, the "Cuban government places restriction on foreign investment in Cuba," and "hotels cannot be freely bought and sold by non-Cuban entities." Trial Tr. vol.7, 40:9-20; *see also id.* 109:9-21 (Defendants' expert: hotel purchases in the Caribbean "tend to be leveraged" but "I don't know if a single of my banking clients that would place a loan on a hotel acquisition in Cuba"). In his actual valuation, however, Nardozza ignored that reality and assumed the opposite: "that the hotels could be sold to private investors." *Id.* 41:12-16. He *stated* that he considered Cuba-specific political and economic risks, but his actual opinion essentially assumed away Cuba.

Courts engage in a three-part inquiry to determine the admissibility of expert testimony, considering whether: "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Quiet Tech. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–41 (11th Cir. 2003); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Regarding reliability, the Court "must focus on the expert's principles and methodology," and must not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1305 (11th Cir. 2014). Regarding the third inquiry, "[e]xpert

---

[5] Defendants objected to Nardozzo's undisclosed opinion regarding the separate valuation of the land. Trial Tr. vol.7, 37:2-19. A party "is not allowed" to use at trial testimony that was not timely disclosed. Fed. R. Civ. P. 37(c)(1). The Court offered to recess the trial to allow further discovery but did not exclude Nardozza's new opinion or instruct the jury to disregard it. *Id.* 81:13-82:4.

[6] In their motion for new trial, filed contemporaneously with this Rule 50(b) motion, Defendants suggest in the alternative a remittitur to 18% of the fair market value sum found in the jury's verdict.

testimony which does not relate to any issue in the case is not relevant, and, ergo, non-helpful." *Wright v. Blackman*, No. 21-14244-CV, 2022 WL 18584336, at *4 (S.D. Fla. Feb. 24, 2022).

Nardozza's testimony was not reliable because it ignored the political reality in Cuba and assumed that the hotels could be freely bought and sold. It was also not helpful to the jury because it did not reflect the proper measure of damages. Nardozza's testimony is therefore no evidence of damages to support the jury's verdict. The Court should grant judgment as a matter of law. *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, No. 1:04 CV 1082 TWT, 2006 WL 1663357, at *5 (N.D. Ga. June 14, 2006) (holding that unreliable expert opinions were no evidence of damages and granting Rule 50(b) motion for judgment as a matter of law), *aff'd*, 496 F.3d 1231 (11th Cir. 2007).

> 3.   The damages calculation violates due process and reveals Plaintiff's lack of constitutional standing.

The total revenue attributable to bookings at the hotels was about $225,684.[7] The jury found that the current market value of the hotels is $9,950,000. 22620-477 Q.5. Plaintiff presented no evidence that he suffered any actual injury; that is, he presented no evidence that he would have a single cent more money had Operating Defendants and nonparty Expedia, Inc. ("Expedia-WA") never facilitated bookings at the hotels. The statutory damages are thus completely untethered from any actual economic aspect of Defendants' alleged trafficking and wildly disproportionate to any benefit received. This disconnect implicates due process and standing.

> a.   Due Process

It is true that Congress enjoys some latitude when defining the appropriate measure of statutory damages, but the constitution imposes limits on that latitude. Statutory damages violate due process if they are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable" in light of the statute's goals. *St. Louis, I. M. & S. Ry. v. Williams*, 251 U.S. 63, 67 (1919). The statutory measure of damages under the Act does precisely that.

The statutory damages of $9,950,000 are **forty-four times** more than the revenue received for all bookings at all three of the hotels offered by Operating Defendants and Expedia-WA. If the statutory damages are trebled, the ratio of damages to revenue increases to a whopping **132:1**. The disproportion is even more egregious if you consider just Orbitz. The lodging booking spreadsheets show that Orbitz facilitated lodging bookings three times at the Pullman and five times at the Mojito, for total revenue of $941.92.[8] D-196-A, D-196-B. Plaintiff asks this Court to render judgment

---

[7] Lodging bookings generated $105,684 in total revenue. D-130. For 3PP bookings, nonparty Expedia, Inc. ("Expedia-WA") received $165,000 Canadian dollars in revenue, which converts to about $120,000 U.S. dollars. Christine McDonald Depo. Dkt.469-1 182:05-182:15.

[8] Orbitz also had a few 3PP bookings at the Pullman. D-191. The bulk of 3PP bookings were by non-party Expedia-WA, and the total commissions received for all 3PP booking at all hotels was about $120,000. Orbitz's 3PP commissions were thus necessarily much less than that sum.

against Orbitz for $29,940,000, which would be **31,786 times** greater than the revenue Orbitz earned for allegedly trafficking in the properties. Ratios of that level are plainly "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *Id.*

The ratios are so disproportioned because the statutory measure of damages is unrelated to any actual economic aspect of the transactions. The resulting disconnect demonstrates that, while the statutory measure of damages may be reasonable in some applications, its actual operation may, as it did here, go far beyond constitutional limits. An opinion from the Ninth Circuit illustrates the principle "that even if the TCPA's statutory penalty of $500 per violation is constitutional, an aggregate award of $925,220,000" violates due process. *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1120 (9th Cir. 2022). The court explained that "constitutional due process concerns are heightened where, as here, statutory damages are awarded as a matter of strict liability when plaintiffs are unable to quantify any actual damages they have suffered." *Id.* The aggregated statutory damages thus implicate due process "even where the per-violation penalty is constitutional." *Id.* at 1123.

So too here. The current fair market value of the trafficked property may appear reasonable in theory as a measure of damages to compensate claimants for the confiscation of their property, but its excessiveness and disproportion under the actual facts in this case violates due process.

b.  Article III Standing

In addition to raising due process concerns, the disconnect between the statutory measure of damages and the actual facts demonstrates that Plaintiff lacks constitutional standing to sue for those damages, and the Court thus lacks subject matter jurisdiction over this suit.

"To have Article III standing, a plaintiff must have suffered an injury in fact that can be fairly traced to the defendant's conduct and that can be redressed with a favorable decision." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 922 (11th Cir. 2023). The mere fact that Congress has created a private right of action does not, on its own, support Article III standing sufficient to endow courts with the jurisdiction necessary to adjudicate the statutory claim: "Congress may enact legal prohibitions and obligations. And Congress may create causes of action for plaintiffs to sue defendants who violate those legal prohibitions or obligations. But under Article III, an injury in law is not an injury in fact. Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

Standing has been the subject of numerous Helms-Burton decisions because the true injury to claimants like Plaintiff was the Cuban government's confiscation of their property, and it is difficult to identify any concrete, particularized injury suffered by a claimant that is *traceable to an allegedly-trafficking defendant's conduct*. After all, Defendants did not confiscate the property, or build or operate the hotels. Several courts, including the Eleventh Circuit in *Garcia-Bengochea*, have concluded that

claimants similarly situated to Plaintiff satisfy those elements and thus have standing. *Id.* at 923-27. But all of those cases, including *Garcia-Bengochea*, analyze standing at the pleading stage. None have addressed the issue once the case has been tried, when the actual evidence demonstrates that Plaintiff has no concrete and particularized injury traceable to Defendants' bookings. But Plaintiff must demonstrate standing at every stage of litigation, including at trial: "A plaintiff must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation. Therefore, in a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing must be supported adequately by the evidence adduced at trial." *TransUnion*, 594 U.S. at 431 (2021) (cleaned up) (class members failed to present evidence at trial of a concrete injury and thus lacked standing).

*Garcia-Bengochea* concluded that the claimant adequately plead a concrete and particularized injury that was traceable to the cruise-line defendants' use of docks he claimed were confiscated by the Cuban government. The court concluded that the claimant alleged a pocketbook injury because the cruise-lines failed to "obtain permission and pay for use of the property." 57 F.4th at 924. The discussion of the alleged pocketbook injury identified measures of potential damages that are tied to the cruise-lines' use of the confiscated property and are distinct from the confiscation itself. *See, e.g., id.* ("Congress knew that the Cuban government had wrongfully confiscated property from U.S. nationals, and enacted Title III for the very purpose of *denying traffickers any profits they might obtain* by subsequently exploiting the wrongful seizures."; "If *the property produced rental income*, for example, the just compensation analysis can include the amounts that would have been received by the owner during the useful life of the property."; [I]n the takings scenario a court takes into account *the stream of future income* in determining overall just compensation. . . .") (emphasis added).

"Central to assessing concreteness" for purposes of standing "is whether the asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts—such as physical harm, monetary harm, or various intangible harms." *TransUnion*, 594 U.S. at 417. "That inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* at 425. *Garcia-Bengochea* reasoned that the alleged pocketbook injury was sufficiently concrete, and the claimant had standing to pursue the statutory claim, because Helms-Burton "bears a close relationship to unjust enrichment, which has undisputable common-law roots." 57 F.4th at 925. But the defining characteristic of an unjust enrichment claim is the right to recover restitution from the defendant, measured by the defendant's unjust gains. Restatement (Third) of Restitution & Unjust Enrichment § 1 ("A person who is unjustly enriched at the expense of another is subject to liability in restitution." (emphasis added)); *id.* cmt. d ("[T]he law of restitution identifies those circumstances in which a person is liable for benefits received, *measuring liability by the extent of the benefit*." (emphasis added)); *see also Virgilio v. Ryland Grp.*, 680 F.3d 1329,

1337 (11th Cir. 2012) (explaining that unjust enrichment seeks recovery of a benefit plaintiff conferred on the defendant that would be inequitable for defendant to retain).

The supposed pocketbook injuries *Garcia-Bengochea* describes—such as "denying traffickers any profits they might obtain"—are the sort of remedies available for unjust enrichment. The reasoning of *Garcia-Bengochea* and other courts that have analyzed standing in Helms-Burton cases thus holds true at the pleading stage, when allegations of injury *traceable to the actual conduct of the defendant* are sufficient to survive dismissal. But this case is long past the pleading stage. It has been tried, and at trial Plaintiff presented no evidence of any injury *traceable to Defendants facilitating bookings at the hotels*. He does not seek disgorgement of Defendants' profits, or an income stream from the hotels, or any such remedy that is "closely related" to unjust enrichment. Plaintiff offered no evidence or theory of injury other than the statutory damages measure the Act provides.

Moreover, the statutory damages are unrelated to a proper remedy for unjust enrichment: disgorgement of Defendants' $225,684 in revenue from the bookings. Plaintiff's counsel asserted that this case is "not about unjust enrichment." Trial Tr. vol.8, 125:24; *see also id.* vol.10, 29:7-8 ("The law here is not a question of, as the Court has pointed, unjust enrichment"); *id.* 30:21 ("it's not a matter of unjust enrichment"). The "close relationship" between the Act and unjust enrichment is the linchpin of holdings like *Garcia-Bengochea* that allegations of pocketbook injuries from trafficking in confiscated property are sufficiently concrete to allege standing at the pleading stage. But Plaintiff's counsel expressly disclaimed that linchpin at the time of trial.

As noted above, Plaintiff must demonstrate standing at every stage of litigation, including at trial. General claims of a pocketbook injury may suffice to allege standing at the pleading stage, but *actual evidence* of such an injury is required at trial. Plaintiff presented no evidence at trial of a concrete and particularized injury that is traceable to Defendants facilitating bookings at the hotels.[9] He therefore lacks standing, and the Court should dismiss his claims.

D.    The residential use exception to the Helms-Burton Act applies.

At trial, Esther Sanchez Echevarria testified that there were many houses on Cayo Coco before the revolution, particularly on the north side, and "multiple families lived there." Trial Tr. vol. 2, 147:20-25-148:1-8. There was other evidence of multiple houses on the island. *See, e.g.*, PLA0011 p.000598 (lease signed by Julian Cuevas allowing lessee to live in "a house he has on the beach in front of the dock" and arranging "for the building of another" house).

The Helms-Burton Act grants a cause of action to U.S. nationals who own a claim to confiscated "property." 22 U.S.C. § 6082(a)(1)(A). The Act's definition of *property* excludes "property used for residential purposes unless, as of March 12, 1996," (i) the claim to the property is certified under

---

[9]  In their motion for new trial filed contemporaneously with this motion, Defendant suggest a remittitur to disgorgement of the revenue from facilitating bookings at the hotels.

the International Claims Settlement Act of 1949 or (ii) the property is occupied by a Cuban Government or political-party official. 22 U.S.C. § 6023(12)(B).

According to Esther Sanchez Echevarria's testimony, there were many houses and families on Cayo Coco, particularly on the north side. Areas of Cayo Coco were thus used for residential purposes before the alleged confiscation by the Cuban government. Plaintiff offered no evidence that the hotels were not located where those houses had been, nor did he make any attempt to establish that either exclusion to the exception applies. Plaintiff thus failed to offer evidence that the area of Cayo Coco where the hotels were built come within the definition of *property* under the Act.

The Eleventh Circuit has made clear that a Helms-Burton claimant has the burden to prove that the <u>specific</u> confiscated property was used in the trafficking. *DeFernandez v. Seaboard Marine, Ltd.*, 135 F.4th 939, 956(11th Cir. 2025). The plaintiff in that case alleged that the defendant trafficked in her confiscated property by "transporting Seaboard's goods inland across land that Azucarera owned." *Id.* The Eleventh Circuit held that the plaintiff failed to meet her burden of proof, and summary judgment was therefore proper, because plaintiff failed to prove that the goods could not have been transported some other way: "it is speculation to conclude that the *only* way to access the terminal is over land that was confiscated from Azucarera. But a jury cannot infer facts based on speculation and conjecture." *Id.* (court's emphasis). The Court went on to reject such speculation: "In short, Fernandez has enough evidence to hypothesize that TCM or Taina *could* have used or benefitted from confiscated land…. But that kind of speculation is not enough of a showing that the jury could reasonably find for the Fernandez." *Id.* at 957 (court's emphasis).

So too here. The evidence established that there were houses on the northern coast of Cayo Coco before the revolution, and families lived there. There is nothing but speculation to conclude that the hotels were not built on land where the houses were. The hotels *could* have been built on land where there were no houses. But a jury cannot base its decision on "speculation and conjecture."

E.       The Corporate Entities

1.       There is no evidence to hold Expedia Group, Inc., liable for trafficking.

Expedia Group, Inc. is a holding company for corporate subsidiaries, primarily nonparty Expedia-WA, and Expedia-WA is the ultimate parent for Orbitz and Hotels.com LP. Expedia Group, Inc. does not conduct any travel-related business. It does not own servers, computer systems, or internet domain names. Trial Tr. vol.4, 8:25-9:2. Expedia-WA, not Expedia Group, Inc., "is really the operating company for not only the Expedia brand, but it's also the parent company for the other operating companies, for our other brands like Orbitz and Hotels.com." *Id.* at 7:4-7. Indeed, Expedia Group, Inc. does not even own the trademark to the name "Expedia Group" or the associated logo. Expedia-WA owns that trademark. *Id.* at 9:3-4. The trade name "Expedia Group" is therefore

used by Expedia-WA to describe the collection of travel brands operated by Expedia-WA or subsidi-aries of Expedia-WA When Expedia-WA employees interact with, for example, hotels they contract with, "they're not just representing the brand Expedia. They're also representing Orbitz and Ho-tels.com, so we need some way to explain that and to talk about it. *And so they use the name Expedia Group to basically describe that collection of brands*." *Id.* at 9:9-18. Use of the Expedia Group name in logos and marketing materials is thus not nefarious evidence of "trafficking" by Expedia Group, Inc., as Plaintiff contends, but rather reflects that the name "basically describe[s] that collection of brands" operated by Expedia-WA and its subsidiaries. *Id.* Plaintiff claims that Expedia Group di-rectly communicated with hotel partners about business strategy and operations involving Cuba in-ventory, but the exhibits identify *all of the Expedia brands*, and are not evidence of conduct *by Expedia Group, Inc. See, e.g.*, PLA0273; PLA0609.

Plaintiff has argued that Expedia Group may be liable for the conduct of its subsidiaries be-cause revenue from other Defendants' bookings flowed to Expedia Group as profit. There is no evi-dence to support this contention. Expedia Group, Inc.'s SEC 10-K filing is a consolidated financial statement that simply consolidates *for reporting purposes* revenue from all of the members of the cor-porate family. PLA0076. Indeed, the first page of the 10-K explains that "Expedia Group" in that filing refers to all of the entities in the Expedia family, not just Expedia Group, Inc.: "We refer to Expedia Group, Inc. *and its subsidiaries*…collectively as 'Expedia Group,' the 'Company,' 'us,' 'we' and 'our' in this Annual Report on Form 10-K." PLA0076 p.1 (emphasis added). The financial reporting thus simply shows consolidated financial performance for Expedia Group, Inc.'s subsidiaries. In fact, there was no evidence that Expedia Group, Inc. received a dime from any revenue earned by the other Defendants for bookings, and the sole exhibit showing Defendants' revenue does not indicate that any of it flowed to Expedia Group, Inc.:

| Sum of RMD | | Use_Year | | |
|---|---|---|---|---|
| EID | PropertyName | 2018 | 2019 | 2017 |
| 546066 | Hotel Colonial Cayo Coco - All Inclusive | $121 | $619 | |
| 546066 Total | | $121 | $619 | |
| 19076069 | Pullman Cayo Coco | $43,972 | $44,532 | |
| 19076069 Total | | $43,972 | $44,532 | |
| 20163618 | Iberostar Mojito | $9,545 | $6,124 | $772 |
| 20163618 Total | | $9,545 | $6,124 | $772 |
| Grand Total | | $53,638 | $51,274 | $772 |

D-130.

Nor can Expedia Group, Inc. be liable under the Act's provision that one can traffic in con-fiscated property by "causing, directing, participating in, or profiting from" trafficking by another. 22 U.S.C. §6023(13)(A)(iii). There was no evidence of any activity by Expedia Group, Inc., to "partici-pate" in any alleged trafficking, or that it "directed" or "profited from" alleged trafficking by any Defendant or non-party Expedia-WA Plaintiff "has enough evidence to hypothesize that" Expedia

Group, Inc. "*could* have directed or profited from that trafficking. But that kind of speculation is not 'enough of a showing that the jury could reasonably find for'" Plaintiff. *de Fernandez*, 135 F.4th at 957 (emphasis in original). Moreover, that provision is intended to capture participation and profit in the trafficking of third parties, not corporate subsidiaries. Just as a corporation cannot conspire with its own wholly-owned subsidiary, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 776 (1984), a holding company like Expedia Group, Inc. cannot be liable for trafficking based on "participating in" the conduct of its wholly-owned subsidiaries. If the rule were otherwise, that provision of the Act would allow any claimant to double-dip on Helms-Burton liability by pleading that a parent corporation shared in revenue from trafficking by its subsidiaries.

Which leads to the ultimate fallacy in Plaintiff's theory: the conduct he claims is *trafficking* in this case are the bookings, and Expedia Group, Inc. never facilitated booking any rooms, not in the subject hotels nor anywhere else in the entire world. Plaintiff did not sue Expedia-WA, an entity that actually facilitated bookings. It instead chose to sue Expedia Group, Inc., a distinct entity, but it asks the Court to render judgment against Expedia Group, Inc. for alleged trafficking done by Expedia-WA. The Supreme Court recently confirmed that corporate distinctions are meaningful, and courts may not lump affiliates together for purposes of determining "defendant's profits," even if the entire corporate group ultimately receives the profits. *Dewberry Group, Inc. v. Dewberry Engineers, Inc.*, 145 S.Ct. 681, 687(2025). The Court explained: "it is long settled as a matter of American corporate law that separately incorporated organizations are separate legal units with distinct legal rights and obligations. And that is so even if the entities are affiliated—as they are here by virtue of having a common owner." *Id.* Even if observing corporate formalities would "otherwise insulate infringing conduct from any penalty," a court may not ignore "the distinction between a corporate defendant…and its separately incorporated affiliates. By treating those entities as one and the same, the courts below approved an award including non-defendants' profits—and thus went further than the Lanham Act permits." *Id.* at 688; *see also United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation…is not liable for the acts of its subsidiaries.").

There is thus no evidence that Expedia Group, Inc. trafficked in the subject hotels.

    2.    <u>Orbitz and Hotels.com LP did not facilitate bookings at all hotels.</u>

The evidence of all of the bookings Operating Defendants and Expedia-WA facilitated at the subject hotels appear in the booking spreadsheets, which are the following trial exhibits: D-178, D-190, D-191, D-196A, D-196B, D-196C. The evidence showed that Orbitz never facilitated any bookings at the Colonial Cayo Coco hotel. And Hotels.com never facilitated any 3PP bookings at any of the Subject Hotels at any time. The last lodging bookings facilitated by either Orbitz or

Hotels.com was before July 1, 2019, which was before Defendants had notice of Plaintiff's claim. These Defendants are entitled to judgment as a matter of law as to any claim based on such bookings.

Defendant Hotels.com GP, LLC is the general partner of Defendant Hotels.com LP. Hotels.com LP is the entity that facilitated bookings at the hotels. Hotels.com GP, LLC did nothing at all distinct from the actions of its limited partner, Hotels.com LP. There is no basis to hold Hotels.com GP, LLC liable under the Act independent of any liability against Hotels.com LP.

F.  <u>Defendants did not "knowingly and intentionally" traffic in confiscated property.</u>

To prove trafficking, Plaintiff must show that Defendants "**knowingly and intentionally**…engaged in commercial activity using or otherwise benefitting from confiscated property…without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A) (emphasis added). The Eleventh Circuit very recently issued an opinion that reflects a significant advancement in understanding the Helms-Burton scienter element. It clarifies both the high standard required to demonstrate that a defendant "knowingly and intentionally" trafficked in confiscated property and also the scope of information that the defendant has to have known. *Del Valle, et. al. v. Trivago GMBH, et al.,* No. 23-12966, 2025 WL 1443951 (11th Cir. May 20, 2025). *Del Valle* confirms that Defendants are entitled to judgment as a matter of law because there is no evidence that they "knowingly and intentionally" trafficked in confiscated property.

*Del Valle* explained that the term *knowingly*—which the Act defines to mean "with knowledge or having reason to know," 22 U.S.C. § 6023(9)—"invoke[es] a recklessness mens rea" and, thus, requires that a defendant have information that makes the plaintiff's claim "substantial" or "highly probable." *Del Valle,* 2025 WL 1443951, at *4. Thus, "if Defendants don't have information that makes [a plaintiff's] claim to confiscated property in Cuba 'substantial' or 'highly probable,' then Defendants are not liable." *Id.* The court also reiterated that the scope of information the defendant must have includes not just that the property was confiscated, but also that the confiscated property "belong[s] to Americans," i.e., that the plaintiff actually owns the claim to the property and that the plaintiff is a U.S. national. *Id.* at *5; *see also id.* (holding that complaint did not, "without more," give rise to a "reasonable inference" that defendants "had reason to know they were trafficking in confiscated American property"); *id.* at *4 ("[T]he statute imposes liability on individuals who recklessly disregard the fact that properties in which they are trafficking would belong to U.S. nationals if they had not been confiscated by the Cuban government.").

Applying that rule, the Eleventh Circuit concluded that each theory of notice presented by Del Valle fell short. The court rejected an argument—which Plaintiff has made in this case (Trial Tr. vol. 8, 60:9-62:10)—that President Clinton's signing statement for the Helms-Burton Act was sufficient to put the defendants on notice. *Id.* at *5. Del Valle alleged further that the defendants

continued to traffic after receiving a pre-suit letter from his counsel (who is also Plaintiff's counsel here) and after receiving and reading Del Valle's complaint. *Id.* But the court concluded that both of those documents contained, at best, "unsworn assertions of property ownership" and "the story of ancestral inheritance," which were "not enough to put Defendants on notice of a 'substantial' or 'high[ ]' likelihood that Del Valle owns a claim to the allegedly confiscated beachfront property." *Id.* at *6. *Del Valle* explained that "bare, unsworn assertions" of ownership, confiscation and U.S. citizenship are not enough to put a defendant on notice, even if those assertions are in a complaint or a demand letter. Actual *evidence* of the critical facts is required: "Del Valle needed to proffer along with his complaint—or even his letters—sufficient *evidence* to put Defendants on notice of 'substantial' or 'high[ ]' probability that his claims are true." *Id.* (emphasis added).

Under *Del Valle*, Defendants are entitled to judgment as a matter of law. As in *Del Valle*, Plaintiff was required to prove that Defendants "**knowingly and intentionally**…engaged in commercial activity using or otherwise benefitting from confiscated property…without the authorization of any United States national who holds a claim to the property." 22 U.S.C. § 6023(13)(A) (emphasis added). Or, as the Court in *Del Valle* put it, Plaintiff was required to prove that Defendants "had reason to know they were trafficking in confiscated American property." 2025 WL 1443951, at *5. Plaintiff did not and cannot. As such, a reasonable jury would not have a legally sufficient evidentiary basis to find that Defendants trafficked under the Act. *See Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1278 (11th Cir. 2005) ("A district court should grant judgment as a matter of law when the plaintiff presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action").

Echevarria's August 2019 letters provided no more detail than the letters the Eleventh Circuit deemed insufficient in *Del Valle*. Del Valle's letter "warned only that he was 'the rightful owner of property located in Varadero' and 'intends to sue' Defendants because they have 'trafficked in the property, as those terms are defined in 22 U.S.C. § 6023, confiscated by the Cuban government from the Del Valle family." *Del Valle*, 2025 WL 1443951, at *5. Echevarria's August 2019 letters contained nearly identical allegations with respect to Cayo Coco, claiming that "Mario Echevarria and the Echevarria family ('the Echevarrias') [are the] rightful owners of Cayo Coco, Cuba." As in *Del Valle*, Echevarria's letters are insufficient to make Echevarria's claim to Cayo Coco "highly probable." Nothing in the letters attempts to explain how Mario Echevarria came to own a claim to Cayo Coco. Perhaps most significant, the letters here did not attach *any* evidence or substantiation of ownership. The letters therefore provided nothing more than "bare, unsworn assertions of property ownership." 2025 WL 1443951, at *6.

Echevarria's original complaints—which did not even assert causes of action against Defendants—likewise contained only "bare, unsworn assertions" that Plaintiff and his family "have been rightful owners" of a claim to Cayo Coco. 22620-12, ¶ 20; 22621-11, ¶ 17. Echevarria did not

include allegations to explain how he allegedly inherited his claim until he filed his second amended complaints in June 2020. 22620-75, ¶¶ 21-30; 22621-41, ¶¶ 19-24. Nor did the earlier complaints attach any *evidence* to support his allegations of ownership and inheritance. That omission is fatal to scienter under *Del Valle*. "Bare, unsworn assertions of property ownership, even bolstered by [a] story of ancestral inheritance …, are not enough to put Defendants on notice of a 'substantial' or 'high[ ]' likelihood that [an individual] owns a claim to the allegedly confiscated…property." *Del Valle*, 2025 WL 1443951, at *6. After all, as the Eleventh Circuit recognized, "[a]ny defendant has an obvious reason to doubt the veracity of a plaintiff's naked claim to confiscated property: given the risk of the Helms-Burton Act's expansive liability (including, in cases of pre-complaint notice, treble damages), some plaintiffs may hope to win a quick settlement to which they may not be entitled." *Id.* (cleaned up). Moreover, "the basic records that would establish a claim to property ownership—deeds, mortgage agreements, trust documents, wills, birth certificates, death certificates—are normally within the plaintiff's, not the defendant's possession." *Id.*

The first time any of the Defendants received more than "bare, unsworn assertions" was when Echevarria's counsel made his first document production on July 27, 2020, which was long after any booking was made at any of the Subject Hotels through any website operated by Defendants or non-party Expedia-WA and long after April 25, 2020—the last date any individual stayed in any of the Subject Hotels pursuant to a booking made through any website operated by Defendants or non-party Expedia-WA *See* D-178 (Colonial Third-Party Package Bookings); D-190 (Iberostar Mojito Third-Party Package Bookings); D-191 (Pullman Cayo Coco Third-Party Package Bookings); D-196A (Pullman Cayo Coco Lodging Bookings); D-196B (Iberostar Mojito Lodging Bookings); D-196C (Colonial Lodging Bookings). Because Plaintiff had only provided Defendants with "unsworn assertions of property ownership" at the time bookings were made, and at the time of travel under those bookings, Defendants did not act "knowingly" or "intentionally" and therefore could not, as a matter of law, have "trafficked" in confiscated property under the Act.

Even if the Court determines that the letters from counsel were sufficient to put Defendants on notice of the claims, as discussed above in section D.2 and reflected in the booking spreadsheets, not every Defendant facilitated bookings at every hotel after the date of the letters. The evidence will thus not support any judgment against Orbitz or Hotels.com as to any hotel.

If the Court determines that there was evidence that some Operating Defendants or Expedia-WA "knowingly and intentionally" trafficked as to at least some of the hotels, the evidence will not support *trebling* as to every hotel as to every Defendant because the Last Booked Date for all of the bookings facilitated by Orbitz and Hotels.com at all of the hotels was before Defendants received Plaintiff's letters on August 7, 2019. And, the Last Checkout Date for all of the bookings facilitated by Orbitz at all of the hotels and by Hotels.com at the Mojito were also before the Letter

Date. Because trebling is allowed only if a defendant continues to traffic more than thirty days after written notice, the evidence will not support trebling here as to many of the Defendants.

G.    <u>There was no evidence the hotel bookings were not incident to lawful travel.</u>

On the element of *trafficking*, there was no evidence that the bookings were not incident to and necessary for lawful travel.[10] The lawful travel exception is not an affirmative defense, but instead is an element of Plaintiff's claim on which he bears the burden of proof because it is part of the definition of *traffics*.  The Court's Jury Instructions included the lawful travel exception as part of the confiscation element of Plaintiff's cause of action: "'Trafficking' does not include transactions and uses of property incident to lawful travel to Cuba, to the extent that such transactions and uses of property are necessary to the conduct of such travel." 22620-492 p.11. Plaintiff did not object to that instruction or to its placement as part of his cause of action.

To prove "trafficking," Plaintiff bore the burden to prove that Defendants' bookings at the hotels were not necessary or incident to lawful travel, and he failed to proffer any such evidence. Plaintiff challenged the drop-down menu in the self-certification module as including only the twelve approved OFAC categories for travel (and lacked "none of the above"). He criticized their marketing for "fun and sun" beach vacations and use of the word "tourism" to describe travel to Cuba. All of that evidence, Plaintiff argued, demonstrated that Defendants' conduct in facilitating bookings at the hotels was not incident or necessary to lawful travel. But the mere fact that a traveler stayed on Cayo Coco does not foreclose lawful travel to Cuba. Indeed, Plaintiff's agent Enrique Reboredo testified that there is nothing inconsistent "with certifying you were going to Cuba for a family visit and then spending two days and two nights at Cayo Coco." Trial Tr. vol.5, 103:19-24.

Plaintiff offered no evidence regarding whether travelers who booked rooms through Defendants were engaged in lawful travel to Cuba in compliance with OFAC regulations.[11] Indeed, the only evidence in the record was that each traveler self-certified a lawful reason for travel. Travelers booking rooms through Defendants' websites *could have* lied when using the drop-down menu to self-certify that they were travelling for one of the twelve approved reasons, or they *could have* spent time on the beach rather than visiting family. But without evidence regarding the actual travel, it is a mere guess whether the bookings were incident or necessary to lawful travel, and "a jury may not infer facts based on speculation and conjecture." *de Fernandez,* 135 F.4th at 956.

---

[10] Defendants advanced this ground for judgment as a matter of law in open court. Trial Tr. vol.7, 165-166.

[11] The spreadsheets showing bookings by hotel with reasons for travel are D-026, D-128, and D-129. Of course, only bookings with Checkout Dates after the Letter Date (if that is the operative notice date) could be *trafficking* under the Act and thus relevant to the lawful travel exception.

H.   Helms-Burton does not apply to property confiscated from a Cuban national by the Cuban government.

More than a decade ago, the Eleventh Circuit explained that property "owned by Cuban nationals at the time of its expropriation…may not be the proper subject of a trafficking claim under the" Helms-Burton Act. *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 n.3 (11th Cir. 2006). That conclusion bars Plaintiffs' claims because he alleges domestic takings: Cuban appropriation of property from Cuban nationals.

To bring a Helms-Burton suit, a plaintiff must own a "claim to" the trafficked property, 22 U.S.C. § 6082(a)(1)(A). But no provision of the Act itself creates claims. On the contrary, the Act is clear that plaintiffs must have owned their claims before the Act came into effect. 22 U.S.C. § 6082(a)(4)(B). In other words, Title III "create[s] value for claims." *Garcia-Bengochea*, 57 F.4th at 936 (Jordan, J., concurring). That is, Title III offers a mechanism to "monetize," pre–existing claims, but it does not create claims. And for that reason, the Act repeatedly references claims that already exist. E.g. 22 U.S.C. § 6082(a)(1)(A).

Since the Act does not itself create claims, the claims it monetizes must come from somewhere. For many Helms–Burton plaintiffs, that poses no issue: they have certified claims from the Foreign Claim Settlement Commission, 22 U.S.C. § 6082(a)(1)(A)(i)(I), which recognized certain Americans' claims derived from international law, 22 U.S.C. § 1623. Plaintiff does not have such claims. 3d Am. Compl. ¶¶ 57–58. Nor could he because international law has never regulated a nation's taking of property from its own nationals, no matter how wrongful those takings may have been. *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 711 (2021). Nor does any other federal law create claims for property confiscated from Cuban nationals by Cuba.

Without international, federal, or domestic law creating a claim, Plaintiff has no basis to assert that he owns claims. And thus, as the Eleventh Circuit has already explained, his suit here fails. *See Glen*, 450 F.3d at 1255 n.3. Nor is *Glen* alone in concluding that domestic takings law bars claims based on property confiscated from Cuban nationals by the Cuban state. A court in this district recently cited *Glen* and applied the same rule. *See Regueiro v. Am. Airlines, Inc.*, No. 19-CV-23965-JEM, 2022 WL 2399748, at *7 (S.D. Fla. May 20, 2022), *report and recommendation adopted in part*, No. 19-23965-CIV, 2022 WL 2352414 (S.D. Fla. June 30, 2022) (citing *Glen* and explaining: "the court considered whether a claim would have been actionable and concluded that it would not: the property at issue 'was owned by Cuban nationals at the time of its expropriation and thus may not be the proper subject of a trafficking claim under the statute.'").

## CONCLUSION

For the reasons, Defendants respectfully request that the Court enter judgment as a matter of law in their favor.

Dated: July 14, 2025

Respectfully submitted,

SCOTT DOUGLASS & MCCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300 Telephone
(512) 495-6399 Facsimile

By: _____

David D. Shank (*pro hac vice*)
Texas Bar No. 24075056
dshank@scottdoug.com
Cheryl Joseph LaFond (*pro hac vice*)
Texas Bar No. 24104015
clafond@scottdoug.com
Santosh Aravind (*pro hac vice*)
Texas Bar No. 24095052
saravind@scottdoug.com
Jane Webre (*pro hac vice*)
Texas Bar No. 21050060
jwebre@scottdoug.com
Stephen Burbank (*pro hac vice*)
Texas Bar No. 24109672
sburbank@scottdoug.com
Rebecca Jahnke (*pro hac vice*)
Texas Bar No. 24129982
bjahnke@scottdoug.com

AKERMAN LLP
Three Brickell City Centre
98 Southeast Seventh Street, Suite 1100
Miami, FL 33131
(305) 374-5600 Telephone
(305) 349-4656 Facsimile

*/s/ Lorayne Perez*
By: _____

Lorayne Perez
Florida Bar No. 085265
lorayne.perez@akerman.com

*Attorneys for Defendants Expedia Group, Inc.,
Hotels.com, L.P., Hotels.com GP, LLC, and Orbitz,
LLC*

20